*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

JANE CISSELL as trustee of the JANE SHERZER
CISSELL TRUST,

      Plaintiff/Counterdefendant-Appellant,

V

ROBERT BENNETT,

      Defendant/Counterplaintiff-Appellee.

UNPUBLISHED
April 17, 2026
11:07 AM

No. 368823
Livingston Circuit Court
LC No. 2020-030887-CZ

JANE SHERZER CISSELL,

      Plaintiff/Counterdefendant-Appellant,

V

LORIE ANN BENNETT,

      Defendant/Counterplaintiff-Appellee.

No. 368824
Livingston Circuit Court
LC No. 2023-031889-CZ

Before: TREBILCOCK, P.J., and BOONSTRA and LETICA, JJ.

PER CURIAM.

Plaintiff Jane Cissell, acting individually and as the trustee of the Jane Sherzer Cissell Trust, appeals by right the trial court's order, following a bench trial, resolving a property dispute in defendants Lorie Ann and Robert Bennett's (the Bennetts) favor under the doctrine of acquiescence. We reverse and remand for further proceedings.

## I. PERTINENT FACTS AND PROCEDURAL HISTORY

This case arises out of a dispute over the boundary line separating adjoining lakefront properties. The properties were originally under the common ownership of W. H. Sherzer, who acquired the land from Fred and Florence Lake through a 1907 warranty deed. In that deed, the Lakes also granted Sherzer permission to cross "the land lying between the highway on the north" of the property and "along the edge of the marsh." In 1954, members of the Sherzer family

-1-

conveyed, by quit-claim deed, an easterly portion of the property to Helen Sherzer Lamb. The 1954 deed granted additional property rights as follows:

> Also a parcel of land 10 feet wide immediately adjoining the above-described land on the northerly side and containing approximately 0.07 acres of land.

> Also granting to [Lamb] a right of way over the northeast corner of the land owned by the [sellers] as now established, existing and used.

> Also granting to the party of the second part permission to use the right of way between the land owned by the [sellers] and the highway on the North as now established, existing and used, and further as granted and described in [the 1907 deed].

At some point, Jack Sherzer, plaintiff's father and predecessor in interest, acquired title to the portion of the original property remaining with the Sherzer family after the 1954 conveyance (the Sherzer property).

Lamb later conveyed her parcel (the Bennett property) to Eugene and Dorothy Nalepa, who in 1989 conveyed it under a land contract to Gerald Baumgras, who, in turn, conveyed it in 2020 to defendant Robert Bennett. When Baumgras acquired possession of the eastern parcel in 1989, there was a gravel driveway beginning at the western edge of Baumgras's property and winding northwest through Jack's property. Nalepa told Baumgras that the boundary between the properties was marked by an ash tree near the driveway; she said that she had bought additional land from Jack extending from the ash tree to the actual, western edge of the eastern parcel, but there was no written record of that sale. In about 1991, Baumgras built a garage that was on his side of the ash tree according to Nalepa's description of the property. Jack never objected or said anything to Baumgras about the garage's placement. In 1993, Baumgras bought out his land contract with Nalepa, and she conveyed to him a warranty deed that included the same rights of way described in the 1954 deed. That year, Baumgras engaged a land surveyor to complete a mortgage survey, which revealed that the western edge of Baumgras's garage extended onto Jack's property. There is no evidence that Jack was aware of the mortgage survey. Despite the mortgage survey, Baumgras always considered the land extending to the ash tree to be his property because Nalepa had told him that she had purchased that land from Jack. The ash tree eventually died and was replaced by a new tree. Between 1991 and 2008, Baumgras built several more structures that were partially across the survey line, including a shed, a concrete pad, and a three- or four- foot walkway along the western edge of the garage. Baumgras testified that he believed that his property ended at the edge of that walkway.

Jack did not live at his property full time and only visited about two or three times a year, but Baumgras got along well with him. Baumgras did not ask for Jack's permission to build any of the structures across the survey line, and, although he was aware of them, Jack did not offer his permission, object to the improvements, or say anything to Baumgras about them. There was no written agreement that the properties would share the driveway, but Baumgras used the driveway

to access his home.[1] Sometime in the mid-2000s, Baumgras asked Jack for permission to pave the driveway. Jack agreed, and Baumgras paid to have the driveway paved with asphalt. Neither party maintained or entered the wooded berm on Baumgras's side of the driveway, but Baumgras did mow and rake leaves on the cleared area up until he sold the property to Bennett in 2020.

In 2013, plaintiff acquired the western property from her father, Jack. She had the property surveyed, which revealed that Baumgras's concrete pad, garage, shed, and walkway all extended onto her property. Plaintiff testified that she and Baumgras negotiated a solution and agreed that Baumgras would lease the encroachments from plaintiff. Baumgras nonetheless later testified that he believed the property to be his and that he only agreed because plaintiff "bothered the heck out of [him]" about it. The parties executed a Lease, in or around 2016.[2] The Lease provided for Baumgras to lease the encroachments from plaintiff for a 10-year term for the sum of $1.00, and it provided that either party could terminate the Lease with 30 days' written notice.

Around 2020, Baumgras terminated the lease, and he then sold his property to Bennett. Baumgras included a copy of the 2013 survey (identifying the encroachments) and a list of the encroachments in his seller's disclosure statement, although Bennett later testified that he did not see the disclosures when he signed the closing documents. Bennett claimed to have first learned about the encroachments in May 2020, when plaintiff told him that the garage was encroaching on her property and asked Bennett to move the trailer parked on the concrete pad. Plaintiff sued Bennett to quiet title, for common-law and statutory trespass, and for nuisance in fact and nuisance per se. Bennett filed a counterclaim to quiet title under theories of acquiescence, equitable and promissory estoppel, adverse possession, and prescriptive easement. The trial court granted summary disposition to plaintiff on Bennett's claims of adverse possession and prescriptive easement because it found that plaintiff had given permission for the use of the disputed property. In 2022, Bennett conveyed his property to himself and defendant Lorie Bennett, his new wife. Plaintiff then sued Lorie on the same grounds as the original suit and Lorie countersued on the same grounds as the original suit. The trial court consolidated the cases, bifurcated the trial, and held a bench trial on the parties' remaining equitable claims.

Following the bench trial and a visit to the property by the trial court, the trial court ruled in the Bennetts' favor. It found "clear and unequivocal evidence" that the parties' predecessors in interest treated the centerline of the driveway as the true property line since 1907 according to the 1907 and 1954 deeds, far longer than the statutory period of 15 years. It also found that Baumgras and Jack had treated the centerline of the driveway as the property line for the requisite 15-year

---

[1] Bennett testified that the shared driveway was the only way to access his property, but a 1980 land survey depicts an easement for ingress and egress along a road adjoining the Bennett property's' eastern border. Both Robert and Lorie Bennett testified that they asked their guests to visit their property by using a gravel road on their eastern neighbor's property, parking in a grassy area on the side of that road and using a nearby wooden walkway to reach their property. Lorie also testified that their friends often visited the property on boats, which they tied to the Bennetts' dock on the east side of the property.

[2] According to the notarization dates, Baumgras signed the Lease on December 15, 2015, and plaintiff signed it on January 5, 2016, although the parties backdated the Lease to July 19, 2013.

period. Accordingly, the trial court held that Baumgras had acquired title to the land east of the centerline of the driveway under the doctrine of acquiescence. It characterized the Lease as "an ineffectual attempt by Plaintiff to *post hoc* fabricate a paper trail to defeat the transfer of ownership by acquiescence that had already vested in Mr. Baumgras." Based on its conclusion that plaintiff did not own the disputed land, the trial court granted judgment in the Bennetts' favor on all of plaintiff's claims. This appeal followed.

## II. STANDARD OF REVIEW

Quiet-title actions are equitable in nature, and we review equitable rulings de novo. *Houston v Mint Group*, 335 Mich App 545, 557; 968 NW2d 9 (2021). We review a trial court's factual findings for clear error. *Killips v Mannisto*, 244 Mich App 256, 258; 624 NW2d 224 (2001). "A finding is clearly erroneous if the reviewing court, on the whole record, is left with the definite and firm conviction that a mistake has been made." *Pegasus Wind, LLC v Tuscola County*, 513 Mich 35, 45; 15 NW3d 108 (2024) (quotation marks and citation omitted).

## III. QUIET TITLE

Plaintiff argues that the trial court made errors of fact and law when it found that the Bennetts' predecessor in interest had acquired the disputed property under the doctrine of acquiescence. We agree.

"Under Michigan law, parties may acquiesce to a new property boundary line." *Houston*, 335 Mich App at 567. "The three theories of acquiescence include: (1) acquiescence for the statutory period; (2) acquiescence following a dispute and agreement; and (3) acquiescence arising from intention to deed to a marked boundary." *Id*. (quotation marks and citation omitted). The Bennetts only claim to have acquired title under the first theory. "[A]cquiescence to a boundary line may be established where the line is acquiesced in for the statutory period irrespective of whether there has been a bona fide controversy regarding the boundary." *Sackett v Atyeo*, 217 Mich App 676, 681; 552 NW2d 536 (1996). Acquiescence claims do "not require that the possession be hostile or without permission." *Killips*, 244 Mich App at 260. The statutory period to bring an action to recover possession of property is 15 years, MCL 600.5801(4), and "[t]he proper standard applicable to a claim of acquiescence is proof by a preponderance of the evidence." *Killips*, 244 Mich App at 260. When the statutory period expires, the other property owner has "title by virtue of his possession of the land." *Sackett*, 217 Mich at 682. Accordingly, "where adjoining property owners acquiesce to a boundary line for at least fifteen [sic] years, that line becomes the actual boundary line." *Killips*, 244 Mich App at 260.

The doctrine of acquiescence only applies "when there has been some agreement, whether tacit or overt, as to the location of the boundary." *Id*. The existence of a tacit agreement may be implied from the conduct of the parties and other relevant circumstances. *Daley v Gruber*, 361 Mich 358, 362; 104 NW2d 807 (1960). A court may consider evidence of the owners' beliefs, intentions, and knowledge of the boundary line, their possession and use of the property, and their failure to object to another's possession and use. See *Houston*, 335 Mich App at 569-570.

In this case, the trial court clearly erred when it interpreted the 1907 and 1954 deeds. It described the 1907 deed as "the original 1907 grant of a shared driveway, meaning that the shared

driveway has been used by the parties' predecessors in interest since 1907." But in 1907, the properties were under common ownership, so any driveway existing at that time was not "shared." Furthermore, the 1907 deed does not refer to any driveway. It grants permission to cross "the land lying between the highway on the north" of the seller's property and "along the edge of the marsh." There was no other evidence of a marsh in this area, but a 1980 land survey of the parcels surrounding the parties' properties showed a road on the eastern boundary of the Bennetts' and plaintiff's land that runs past the northern boundary of the Sherzer property. That road was subject to an easement for ingress and egress. The 1907 deed likely described a permission to cross the land between what is now plaintiff's property and that northern road, not a permission to cross a driveway (if any then existed) located in the middle of the property.

The 1954 deed extended the property line of the Bennett property on the northerly side of the parcel, but the driveway dispute involves the location of the Bennetts' *western* property line. The 1954 deed also transferred the same easement described in the 1907 deed, along with an additional right of way over the northeast corner of the Sherzer's property. Again, the driveway was located in the middle of the Sherzer parcel, not that northeast corner. The "northeast corner easement" likely referred to a different "gravel drive" that clipped through the northeast corner of plaintiff's property and was noted as an encroachment on plaintiff's 2013 land survey. That encroachment was far north of the disputed driveway in this case. After comparing the 1907 and 1954 deeds to the land surveys, we are left with the definite and firm conviction that the trial court made a mistake when it found that those deeds described or purported to convey any rights to the disputed area. Therefore, we reject the trial court's finding that the parties' predecessors in interest had shared the driveway (as marking the boundary between the properties) for 116 years.

We also hold that the trial court clearly erred when it found that Jack and Baumgras treated the centerline of the driveway as their property line for the requisite 15-year period. The trial court emphasized that Jack never objected to Baumgras's improvements. When it visited the disputed property in July 2023, the trial court observed that the garage, concrete pad, and walkway "had existed in the place where they stand for a long period of time." But this in no way indicates that Jack and Baumgras had tacitly agreed that the property line was the centerline of the driveway. Baumgras, in fact, testified that he believed that the property line was marked by an ash tree, which would have extended his property line to approximately the edge of his walkway. That belief was based on his predecessor's representation to Baumgras regarding the property line when she sold the easterly property to him. In other words, Baumgras's improvements to the land respected his view of the ash tree as the property line, not the centerline of the driveway.[3]

---

[3] We respectfully disagree with our concurring colleague to the extent he may believe that the evidence would support a finding that there was a *mutual* agreement that the ash tree was the property line. There is no evidence that Jack treated the ash tree as the property line. And Baumgras seemingly acknowledged at trial that he and his predecessor may have been mistaken about the ash tree, testifying that "my mother-in-law [and predecessor] says no, I bought over to this other spot [by the ash tree]. Obviously, her and Jack didn't, you know, finalize the deal, I'm guessing, because it was never recorded, I'm assuming, but we just always assumed that that was where it was."

The trial court characterized this case as "strikingly analogous" to *Sackett*, 217 Mich App at 683, in which this Court concluded that the defendants' predecessors in interest had acquiesced to the center of a shared driveway as their property line for the statutory period. But in *Sackett*, the defendants' predecessors in interest actually told the plaintiff that the property line was the centerline of the driveway, and he continued to insist on that property line even after a land survey revealed that he owned the entire driveway. *Id*. at 678. The trial court cited two other examples in which the property owners acknowledged by their words or actions that a specific right of way served as their property line. See *Siegel v Renkiewicz' Estate*, 373 Mich 421, 424; 129 NW2d 876 (1964) (owners fenced around their property but left open a sidewalk on the western edge for the adjoining property's use); *Geneja v Ritter*, 132 Mich App 206, 211; 347 NW2d 207 (1984) (owner referred to the northern edge of a driveway as his property line). By contrast, there was no evidence in this case that the parties' predecessors in interest associated the centerline of the driveway as a reference point for their property rights.

When plaintiff acquired her property in 2013, she hired land surveyors to document the property line. Baumgras testified that he realized that his improvements were on her property when he saw the surveyors staking the property. Plaintiff and Baumgras then executed a Lease, with notarized signatures, providing for plaintiff to lease the "encroachments" to Baumgras. That agreement was backdated to 2013 and recorded with the register of deeds for both properties. The trial court concluded that the Lease had no impact on the action to quiet title because Baumgras had already acquired title to the land described in the Lease under the doctrine of acquiescence. But we hold, to the contrary, that Baumgras had not acquired title to that property because he had no tacit or overt agreement with Jack to treat a particular landmark as the property line. Therefore, the Lease was still relevant because it indicated that Baumgras conceded that his improvements encroached on plaintiff's property. Any claim of acquiescence therefore fails both for lack of an agreement, tacit or overt, on a boundary line other than the actual one, and for failure to satisfy the requisite 15-year statutory period. On our de novo review of the trial court's equitable ruling, we are not convinced by a preponderance of the evidence that defendants or their predecessors in interest acquired title to the disputed property under the doctrine of acquiescence.

Reversed and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Mark T. Boonstra
/s/ Anica Letica